### A. P. LYMAN v. JOSEPH C. HOLLISTER.

</div>

Where the widow of an intestate conveyed, by deed of warranty, in fee, land of which she was endowed, describing the land as part of her dower, and her grantee, by a like deed, conveyed the same land, in fee, to the defendant, describing the land as a part of the estate set out to his grantor " as dower in her late husband's estate," and, afterwards, the same land was sold, at vendue, for taxes, and the defendant purchased it and took a deed to himself;—Held, that the deed from the grantee of the widow to the defendant, operated as a conveyance of the widow's life estate, only, and that the defendant could not avail himself of his vendue deed to defeat the title of the reversioner.

The plaintiff inherited land from his father, which was set out to his mother as her dower. The mother, by deed of warranty, conveyed the land, in fee, to a stranger;—Held, that such collateral warranty did not bar the plaintiff from recovering the land, after the death of the mother.

EJECTMENT, for a parcel of land in Woodford. Plea, not guilty. Issue to the country.

Upon the trial in the county court, it appeared that David Lyman, deceased, was seized of the land in question, at the time of his death; that it was inventoried as a part of his estate, and, subsequently, set out to Sophia Lyman, widow

of the said David, as a part of her dower in the real estate of the said David. It also appeared that the widow, Sophia Lyman, died in June, 1836; that the plaintiff and his sister, Sophia, were the only children of the said David and Sophia, deceased, and that the defendant was in possession of the land when this action was commenced. The plaintiff gave in evidence a deed from his sister, Sophia, to himself, conveying her interest in the land.

The defendant gave in evidence, the records of a vendue, showing a sale of the land in question to the defendant, on the 25th day of July, 1826, for the non-payment of a tax, raised by an act of the legislature, passed at their October session, 1823, taxing the lands in Woodford, and a deed of the same land from William Park, collector of said tax, to the defendant, dated August 10, 1827.

The plaintiff then introduced, as evidence, a deed of warranty of the same and other land, from the widow, Sophia Lyman, to Selden and Rufus Baldwin, dated April 20, 1822, recorded June 22, 1822, and also a deed of the same land from said Selden and Rufus, to the defendant, dated March 20, 1823, recorded March 3, 1825. In all the deeds, the land in question is described as the " *Queen Camp lot*," and in the deed from the widow, Sophia Lyman, to the Baldwins, the lands conveyed are further described as " being the whole set to the said Sophia, except the road since laid through it." In the deed from the Baldwins to the defendant, the land is also further described as the "*same that was set off to Sophia Lyman as a part of her dower of her late husband's estate,* and has since been sold for taxes to Galen Cutler, and has since been sold by him to us."

The county court charged the jury, that, from the evidence, the deeds from Sophia Lyman to the Baldwins and from them to the defendant, would not operate to prevent the plaintiff's recovering in this action.

The jury returned a verdict for the plaintiff, and the defendant excepted to the charge of the court.

*D. Robinson* and *U. M. Robinson*, for defendant.

The deed of William Park, collector, having been established by the court, makes a good title in the defendant.

But it is contended, on the part of the plaintiff, that, from

the legal effect of the deed from Sophia Lyman to the Baldwins, and the deed from them to Hollister, the vendue deed as against the plaintiff, is void; that the defendant stood in the relation of tenant.

But it will be perceived, by referring to the recital in the deed from the Baldwins to Hollister, that the estate had been sold to one Galen Cutler, a stranger, for taxes, and that Cutter sold to the Baldwins and the Baldwins to Hollister. There was a disseizin by Cutler, and Hollister held under him, and not as tenant in dower.

It is evident that the tax, under which Galen Cutler derived his title, must have been levied and the land sold while the widow Lyman was in possession.

While the lands are under the control of the administrator, it is his duty, or that of the heir, to whom the lands descend, to pay the public taxes levied, to benefit the inheritance.   2 Bl. Com. 135, 138.

In the deed from Mrs. Lyman to the Baldwins, she covenanted to warrant and defend the premises for herself and her heirs, and thereby the heir is barred.   Coke Litt. 380, a. Swift's Dig. 365, 366.

Dower is assigned for the sustenance of the wife, and the nurture and education of the younger children.   2 Black. Com. 129.

The legal presumption is, that the property received for the sale of the land was laid out for the support and education of the plaintiff, which, by law, he would be obliged to pay when he came of age, or for the support of the mother, whom the child is under obligation to support, or that it remains as assets for his benefit.

*J. S. Robinson* and *W. S. Southworth*, for plaintiff.

Has the title of the heirs to the reversion been defeated by the conveyances of the widow, through the Baldwins, to the defendant, and by the vendue proceedings ?

1. The conveyance alone certainly could not prejudice the reversion.   The effect of such conveyance would, at common law, be a forfeiture of the particular estate.  1 Saund. R. 319, n. 4.   Bac. Abr. tit. Estate for life.   15 Mass. R. 471 Here it would probably operate as a conveyance of the grantor's interest.   11 Conn. R. 553.

2. The defendant having by these conveyances obtained

BENNINGTON,
*February,*
1839

Lyman
*v.*
Hollister,

an estate for life, no laches, either of his, or of the widow, could prejudice the reversion. 2 Stark. Ev. 1217. 2 Saund. R. 175, d. 11 Conn. R. 553. 5 ibid. 228. 3 ibid. 191. 15 Mass. R. 471.

3. Much less could either of them defeat the reversion and obtain an estate, in fee, for themselves, by suffering the land to be sold for the payment of taxes and purchasing it in.

It was the duty of the tenant for life to pay the tax. He was occupying the land and receiving the profits.

The tenant for life must keep down the interest of incumbrances on the land. *Cogswell* v. *Cogswell,* 2 Edw. R. 231. 1 Chit. Eq. Dig. 354, 360.

The tenant for life is a *trustee* for the remainder man and reversioner. 1 Hill's Chan. R. 374. 1 Amer. Eq. Dig. 454. *Smith* v. *Daniel,* 2 McCord's Ch. R. 149. 1 Amer. Eq. Dig. 449.

These proceedings, therefore, were a fraud *upon the reversioner,* and are *void.* *Blake* v. *Howe,* 1 Aik. R. 306.

This is not the case of a *bona fide* purchaser without notice of the trust. The deeds of the widow and of the Baldwins contained notice.

The opinion of the court was delivered by

ROYCE, J.—The first question is, whether the defendant is entitled to avail himself, as against the present plaintiff, of his vendue title acquired under the deed of William Park, in 1827. Before he acquired that title he must be considered as having held under the deed of Sophia Lyman, whose only right was that of tenant in dower. Her powers and duties, as such tenant, have not been made the subject of dispute in this trial. It is certain that she was bound to act with a due regard to the interests of those having the reversionary estate. She was not entitled to commit waste, or do any act, not essential to the proper enjoyment of her own estate, which would manifestly work an injury to the inheritance. And had the tax, upon which Park proceeded, been imposed upon the land while she remained in possession, as such tenant, it would have been her duty to discharge it. From this it would result, that neither in equity nor law could she be permitted, by exposing the estate to forfeiture, through the neglect of that duty, to gain a new title to herself and devest

the right of the heirs. Her deed to the two Baldwins, it is true, professed to convey the land in fee, as did their subsequent deed to the defendant. But all these parties must be supposed to have known her title. It was matter of record, and is referred to in both of said deeds. Now it is a settled and familiar principle, that an assignee with notice always takes the right assigned, subject to its burdens and liabilities in the hands of the assignor. And, hence, the obvious conclusion is, that, so far as these heirs were concerned, the Baldwins became only tenants for the life of their grantor, and that the defendant took from them the same estate. The Baldwins and the defendant, in relation to the heirs, were, in effect, but successive grantees or assignees of the estate in dower. And we are aware of no principle which should absolve them from those obligations, which belonged to the nature of their estate, and which originally bound the widow herself. Although the attempt to pass an estate in fee, when only a life estate could be conveyed, might give a character to the grantee's possession and claim of title, as to third persons, yet as to the heirs, it had the same effect as a conveyance expressly limited to the life estate. It was, therefore, the defendant's duty to save the property from forfeiture by paying the tax in question. And if he thought a vendue title was needed as a protection of his life estate, that protection should be the measure of benefit to be sought from it.

The remaining point in the case belongs to a branch of common law, which has rarely, if ever, been brought under judicial discussion in this state. It is contended that the plaintiff is barred from asserting his title by force of the warranty contained in the deed of his mother to the Baldwins. All covenants are now practically treated as personal demands, to be enforced against the person or estate of the covenantor, if broken in time to be so prosecuted ; and if the estate has been distributed before a cause of action accrues upon the covenant, it may be followed in the hands of heirs. We have no occasion, however, to decide, in this case, how far the ancient doctrines upon the descent and operation of lineal warranties should be regarded as part of our existing law. The present is a case of collateral warranty, since the plaintiff inherited the land from his father, and not

from the tenant in dower, who gave the warranty. By the original common law, this warranty would be held to have descended upon the plaintiff, and his right to claim the land would be accordingly barred. But the reasons for giving effect to this species of warranty, have, for centuries, been considered as refined and unsatisfactory. The doctrine became odious for its practical injustice, and was abolished by statute, in England, as early as the time of Anne. Some of the states, particularly New York and Connecticut, have thought it necessary or expedient to pass similar statutes on the subject. In this state we have no such enactment, and the question is, whether, in the absence of such a statute, we are bound to enforce this rule of the common law. At an early stage of our existence as a state sovereignty, the legislature adopted so much of the common law of England as was " applicable to our local situation and circumstances, and not repugnant to the constitution, or any statute law of this state." The preamble to this statute alleges, as a principal reason for passing it, that the inhabitants had been accustomed to conform their manners to the law of England. This allusion to the habits and experience of the people is entitled to much weight in the construction of a statute where its terms are so indefinite. It points to the law of England (the *lex non scripta*) as they had been practically acquainted with it. But since the rule, now sought to be enforced, had, for some ages, ceased to form a part of the law of England, there is no ground to suppose that the customs or opinions of our community had been shaped with any reference to it. It would, therefore, seem that, upon this ground, the doctrine contended for might justly be overruled. But a more decisive objection arises from its manifest want of equity and justice. As this has been deemed a good cause for directly abrogating the rule in other places, it must furnish a conclusive reason for saying, in the exposition of our statute, that the rule is not applicable to the situation and circumstances of this state.

<div align="center">Judgment of the county court affirmed.</div>